NEW JERSEY DEPARTMENT OF LABOR,
WORKMEN'S COMPENSATION BUREAU.

ANNA NIEMI, PETITIONER, v. THOMAS IRON CO.,
RESPONDENT.

Decided April 23, 1942.

For the petitioner, *A. Milton Jacobs* (*David Roskein,* of counsel).

For the respondent, *Cox & Walburg* (*Arthur F. Mead,* of counsel).

\*　　\*　　\*　　\*　　\*　　\*　　\*

The only controversial issue here presented for determination is whether or not the death of William Niemi on the 5th day of May, 1938, resulted from an accident that arose out of and in the course of his employment with the respondent company.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The evidence disclosed that William Niemi, age 61, married, had been employed by the respondent at its mine in Wharton, New Jersey, as a stope-machine operator for a number of years. This machine operated by compressed air and the manual manipulation of the employee, was used to drill the rock and ore and employed the same principal as a jack hammer or pavement breaker. However, instead of exerting a downward force, the pressure was directed in an upward direction. It appears that the decedent at all times during his employment had performed his work in an efficient

and satisfactory manner and in fact had been advanced in status to that of an A-1 driller. Throughout his employment he appears to have been in good health and free from any illness or physical incapacity. On May 4th, 1938, at 10:00 P. M. he reported for work as usual, on the night shift, at the iron mines of the respondent. The decedent proceeded with the performance of his customary work, which among other things, necessitated the use of the drill or stoper-machine which weighed about 85 pounds, and which instrument was exhibited at the hearing in this cause. The testimony indicates that during the period from 10:00 P. M. until 2:00 A. M., when the decedent recessed his work for lunch, he bored approximately 18 feet in the stope or shaft where he was stationed. One Steve Lukatos, who was working on the same stope, testified that he and Niemi then descended a ladder to a lower level where both men ate their lunch, which consumed approximately 25 minutes to one-half hour. During this time the decedent appeared to have been conducting himself in his customary manner, and exhibited no outward signs of any unusual distress or illness. After finishing lunch, the decedent, preparatory to resuming his work, obtained two four-foot steel drills weighing about 12 and 15 pounds each (according to the testimony of the foreman), which evidently were required for the work he was to perform, and with these drills in his hands he climbed the ladder, which was stationed at an incline of about 65 degrees, from the lower level to the stope where he was to work, in all, a distance of approximately 85 feet. After climbing the ladder as aforesaid, he was then required to walk or climb a distance of about 35 feet over a muck pile some six or seven feet high and which was inclined at a 35 degree angle, in order to reach the place where he was to resume work. It was indicated that it required some four or five minutes of climbing or walking by the decedent in order to reach this point from the lower level where he ate his lunch. The decedent also requested and obtained from Lukatos a starter drill and was seen by the latter to place same across his knees as the decedent took his station for work. His head lamp, when he reached the upper stope, was observed to be lighted.

From the testimony as well as the demonstrations had in court, it appears that in order for the drilling operation to be commenced, it would be necessary for the employee to lift the 85 pound stope drill, after first inserting therein a steel or bit. Moreover, upon the temporary cessation or suspension of drilling, the steel bit descended partially into the interior of the machine. It was also indicated that the employee could, where the height of the shaft permitted, conduct the drilling operation while seated on the spare drills or steels which he employed as a make-shift seat. According to the testimony, it was customary for the employees upon returning to their station after lunch to start drilling.

Thus it appears that the work on the stope was resumed shortly after the lunch period ended, and some five minutes or more later, Lukatos had occasion to shut off his drilling machine. Upon doing so he observed that there was no light or drilling noise emanating from the side of the muck pile where Niemi was supposed to be working about 15 or 20 feet away. He thereupon crossed over to investigate and found Niemi prostrated on the steel bars which he had evidently employed as a seat in connection with the drilling work. The decedent's face was distorted and he was sprawled out on his back and right side with his head thrown back and his right arm extended. There was some small quantity of blood found on the rocks or pieces of ore nearby and a small wound was seen on the right side of his head. The drilling machine was found lying some four or five feet from his head and his carbide lamp was unlighted, with the bottom thereof separated or removed from the top portion.

While there does not appear to be any eye witnesses to the activities of the decedent during the period that immediately preceded his collapse and death, the absence of the starting drill, which according to the statement ($P$-1 in evidence) had been handed him by Lukatos earlier, coupled with the testimony that upon temporary cessation of the operation of said machine, the drill retreats or descends into the interior of the air gun, as well as the other facts and circumstances adduced in evidence, justifies the conclusion that Niemi had, for a short period of time at least, resumed his regular work after returning from lunch. From the testimony as to the

nature of his duties and my observation in court of the mechanism employed in connection therewith, I am of the opinion that the type of work in which the decedent was engaged was of a heavy and laborious character.

Shortly after its discovery, the decedent's body was removed from the mine of the respondent and an autopsy was performed the same day by Dr. Harry Mutschler, the Morris County medical examiner. His autopsy findings indicated that externally the decedent's head exhibited abrasions in the right parietal region about 1¾ inches long and ¾ of an inch wide. Dr. Mutschler testified that in the course of the removal of the decedent's brain he found evidence of a hemorrhage in that organ. A histological examination disclosed that the vessels of the brain were sclerotic and friable and that several small arteries therein were ruptured with an extravisation of blood into the central brain. The cause of death, according to the diagnosis made on autopsy, was a cerebral hemorrhage with cerebral arteriosclerosis as a contributing cause.

There also appeared and testified on behalf of the petitioner, Dr. George P. Olcott, Jr., an assistant medical examiner for Essex County, who has practiced medicine for upwards of thirty years and whose qualifications were conceded by the respondent. Dr. Olcott testified that in his opinion there was a causal relationship between the death of the employee and the physical activities and effort in which he was engaged immediately prior thereto, in the performance of his duties. He explained that the deceased employee, as disclosed by the autopsy, possessed a pre-existing arteriosclerosis of the blood vessels of the brain, which, over a considerable period of time, had resulted in a degenerative process that weakened and rendered brittle the walls of the said vessels. These, he stated, were rendered less able to withstand any unusual stress or burden imposed upon them by any increased load on the blood circulatory system. Thus the physical activities of the decedent in climbing the 85 foot ladder and then climbing over the muck pile for a distance of about 35 feet at an angle of 35 degrees, carrying the steel drills of some weight, and thereafter participating in other activities either preparatory to or in pursuit of his drilling work, constituted a sustained

effort that resulted in an increase in the blood pressure which, superimposed upon the diseased brittle and weakened condition of the blood vessels of the brain caused a rupture thereof. The opinion and conclusions which he reached were not only predicated upon his extensive medical experience in this field, but also upon the physical findings on autopsy.

On behalf of the respondent, there appeared and testified Dr. Ambrose F. Dowd, a neurologist of many years of experience, whose qualifications were also admitted. This physician was presented by the respondent's attorney with a hypothetical question and in response thereto, rendered an opinion that the employee's death was not connected with any activity related to his employment. The reason given was that the decedent had habituated and conditioned himself to the effort and stress of his employment so that there was not created any increase in the blood pressure or load which the sclerotic and friable blood vessels in the brain were obliged to carry. He admitted that effort and stress under certain circumstances resulted in an increase in the volume of the blood flow, which, if passing through a diseased or necrotic vessel could cause it to rupture. However, he was of the opinion that there was no increase in the decedent's blood flow or pressure as the result of his climbing activities carrying the two drills immediately after the termination of the lunch period, for the reason that the employee had habituated himself to that type of activity. Nor would the size or weight of the drills which he carried while so climbing, alter the doctor's opinion in this regard. Dr. Dowd admitted that the opinion which he expressed was based on his own medical experience which concededly did not include any experiments or tests with the blood pressure of persons engaged in work similar to that of the decedent.

That the decedent met his death as the result of a cerebral hemorrhage while at his station in the stope of the respondent's mine shortly after the resumption of work about 2:30 A. M. seems to be free from any serious dispute. Whether that was due to an accident within the meaning of and adjudications under the Workmen's Compensation Act, as contended by the petitioner, or the result of a spontaneous rupture of the necrotic blood vessels in the employee's brain because of

degenerative processes wholly unrelated to the employment, as urged by the respondent, is the debated question. The petitioner's proofs point to the physical exertion of the decedent in climbing the 85 foot ladder pitched at a 65 degree angle and then clambering over broken rock and ore which comprised the muck pile, at an upward incline of 35 degrees for a distance of approximately 35 feet, carrying two steel drills weighing in the aggregate between 24-30 pounds, and in his participation in or preparation for drilling operations, as the causative factor of an elevation in the decedent's blood circulation which subjected the diseased and sclerotic vessels of his brain to a load which they were unable to withstand, with the result that they ruptured and death ensued. Opposed is the theory advanced by the respondent that the necrotic degeneration of the vessels, by coincidence perhaps, but not by reason of any activity incident to the employment, reached the point that they spontaneously ruptured during the time that the decedent was in the performance of his work.

Considering the evidence as to the physical exertions engaged in by the decedent from the period that immediately preceded his death, and in view of what we now know to have been the brittle and sclerotic condition of the blood vessels of his brain, the opinion of the petitioner's medical expert as to the causal relationship between such sustained effort and an increase in blood pressure or flow, and the ensuing rupture of the weakened arteries, presents a more probable hypothesis than that offered by the respondent. I am unable to accept the theory advanced by Dr. Dowd that the 61-year-old decedent had so accustomed or habituated himself to the activities of his employment, that the physical exertions in which he engaged within a period of from five to ten minutes after the finishing of his lunch, would not result in an increased blood circulation or pressure. Our daily experiences in less arduous activities such as the climbing of flights of stairs or carrying objects of no unusual weight for some distance, are to the contrary. The respondent's expert concedes that necrotic and friable vessels of the brain may be caused to rupture as the result of strenuous physical activity which cause an increase in the blood pressure to which those vessels are subjected. It was his opinion, however, that this did not

occur in the instant case even after the decedent participated in the physical acts thus described, inasmuch as he had habituated himself to these exertions so that there was no ensuing increase in the blood flow through his vessels. It is significant that Dr. Dowd predicated his opinion in this regard entirely upon his general experience as a physician, which did not include any experiments or tests concerning blood pressure changes in men working in mines or occupations similar to that of the decedent.

Thus the respondent's expert attributes the hemorrhage to a rupture of the vessels of the brain solely to the slow progressive degenerative arteriosclerotic process. It must therefore be inferred that by coincidence it took place in the stope of the respondent's mine where the decedent was in the performance of his duties.

The record clearly demonstrated that the employee's health preceding his collapse was apparently good. Nor has the respondent produced any testimony indicating that he had previously suffered any symptoms attributable to a cerebral arteriosclerosis, or lost any time from the pursuit of his occupation as a result of any cerebral or other indisposition. I am of the opinion that such a slow degenerative process in all reasonable probability would not rupture under the circumstances presented in this case without the intervention of an extraneous cause. And where, as here, respondent's expert admits that an increase in blood pressure could be and the petitioner's physican contends was the cause of such a rupture, I am unable to accept the unsupported medical testimony of the respondent that the decedent had acclimated and habituated himself. The more reasonable probabilities, in view of the friable and sclerotic condition of the blood vessels as disclosed on autopsy, indicate the absence of such resistant qualities.

To attribute the hemorrhage solely to the degenerative process which, apparently by coincidence, occurred at a time immediately following a considerable degree of physical exertion on the part of the decedent, but, according to the respondent, was wholly unrelated to the employment, is to ignore the more reasonable and more probable explanation and theory presented by the petitioner's evidence. It is to be borne in

mind that the test under our cases is probability and not absolute medical certainty. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.*, 111 *N. J. L.* 487; 170 *Atl. Rep.* 22; *Hercules Powder Co.* v. *Nieratko*, 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed*, 114 *N. J. L.* 254; 176 *Atl. Rep.* 198. Accordingly, I am constrained to accept the testimony and proofs of the petitioner in this regard.

In determining whether or not an accidental injury has been suffered within the meaning of the act, it should be observed that it need not be the result of traumatic force. *Bernstein Furniture Co.* v. *Kelly*, 114 *N. J. L.* 500; 177 *Atl. Rep.* 554; *affirmed*, 115 *N. J. L.* 500; 180 *Atl. Rep.* 832; and the fact that the injury was accidental may legitimately be inferred from circumstantial evidence. *De Fazio's Estate* v. *Goldschmidt*, 87 *N. J. L.* 317; 88 *Atl. Rep.* 705. Nor need there be any exertion or stress out of the ordinary, where the performance of manual labor entails a strain upon an underlying diseased condition of the employee's anatomy, in consequence of which death occurs. *Molnar* v. *American Smelting and Refining Co.*, 127 *N. J. L.* 118; 21 *Atl. Rep.* (2d) 213; *Hentz* v. *Janssen Dairy Corp.*, 122 *N. J. L.* 494; 6 *Atl. Rep.* (2d) 409; *Ciocca* v. *National Sugar Refining Co.*, 124 *N. J. L.* 329; 12 *Atl. Rep.* (2d) 130; *Bollinger* v. *Wagaraw Building Supply Co.*, 122 *N. J. L.* 512; 6 *Atl. Rep.* (2d) 396. An accident, under our cases, is made out where the reasonable probabilities in view of all of the evidence, indicate that the employee, in putting forth his duties, met his death by reason of the effects of said exertion upon a vital organ already seriously impaired by disease. *Molnar* v. *American Smelting and Refining Co.*, *supra*.

From a careful consideration of all of the testimony and evidence before me, as well as the reasonable inferences to be drawn therefrom, I am constrained to find that the petitioner has carried the burden of proof that her decedent met with an accident arising out of and in the course of his employment with the respondent.

\*    \*    \*    \*    \*    \*    \*

STEPHEN J. LORENZ,
*Deputy Commissioner.*